John Lilegdon, et al., Plaintiffs-Appellants, v. Harry Hanuska, Defendant-Appellee.

Gen. No. 51,631.

First District, First Division.

July 17, 1967.

Rehearing denied August 11, 1967.

James R. Mitchell and Junie L. Sinson, of Chicago (Jurco, Damisch & Sinson, of counsel), for appellants.

Sweeney and Riman, of Chicago (Marvin Riman, of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

Plaintiffs appeal from a jury verdict and judgment for defendant in their action for personal injuries and property damage allegedly incurred by them as a result of an intersection collision.

On appeal, plaintiffs contend the trial court committed prejudicial error (1) in giving the jury instructions on "imputed negligence" and "right of way," and (2) in permitting the defendant's doctor to testify as to a physical examination made of the plaintiff when no timely proffer of the report had been made to the plaintiffs' attorney.

Plaintiffs also contend that the verdict was contrary to the manifest weight of the evidence.

Late in the afternoon of December 30, 1961, plaintiffs (husband and wife) were in an automobile being operated by plaintiff John Lilegdon. Mrs. Estelle Lilegdon was in the front seat with her husband, and their destination was a National Tea store located at the northeast corner of 50th Avenue and 22nd Street. While plaintiffs were in the process of making a left-hand turn at that intersection, defendant's car collided with the right rear side of plaintiffs' car. Mrs. Lilegdon suffered physical injuries, and a considerable portion of the trial involved testimony by experts considering the causal relationship between the trauma suffered by Mrs. Lilegdon and subsequent surgery.

Plaintiff John Lilegdon testified that just before the occurrence they were on 22nd Street, moving in an easterly direction. When they arrived at the intersection of 50th and 22nd Street, the traffic signal for east and westbound lanes was red, so when he approached 50th Avenue he "pulled into the cutout of the highway indicating that I am going to be making a left turn from the eastbound lane on Cermak Road to 50th Avenue going north." They waited for the east and westbound traffic light, and "I proceeded and pulled slowly into the intersection . . . on an angle facing northeasterly, and I stopped there at a standstill. . . . [T]here were three cars that were waiting to get into the National Tea lot on 50th Avenue. If I would have proceeded across the intersection, my car would be protruding into the westbound lane of Cermak Road. . . . [T]here were no cars proceeding in a westerly direction." He remained stopped for seven to ten seconds, and "I sort of glanced sideways, and I thought I saw lights flashing at the side of my car, and then I felt an impact hitting my car, . . . the right side of my car, the rear door and the wheel portion of the rear wheel, and

265

the impact threw my car across into the westbound lane." He was unable to estimate the speed of the other vehicle but characterized it as "fast." After the impact his car was facing southeast in the second westbound lane from the north curb of 22nd Street, about 10 to 15 feet west of 50th Avenue.

Mrs. Lilegdon testified that as they approached the intersection of 22nd and 50th Avenue, they pulled into the cutoff; the light was red when they arrived there, and they waited to make their turn; when the light changed, they "inched over into the intersection," and she did not recall anything happening after that. The next thing she knew, "I know I was lying someplace, but just where it was, I couldn't say." She further testified she was taken to a hospital and related the details of her treatment and subsequent condition.

A witness for plaintiffs, Joseph Grachen, testified he saw the Lilegdon station wagon as it was waiting in the cutout to make a left-hand turn. "It was facing more towards the north than the east," and it had been coming east on 22nd Street. The other vehicle was proceeding west "5 or 10 feet on the south side of the [median] strip going west," and in the side of the street for vehicles going in an easterly direction. The vehicle that was going in a westerly direction "rammed into the right rear of the Ford station wagon," which was standing still. The speed of the westbound vehicle was about 20 to 25 miles an hour. Grachen did not identify himself to anyone at the scene and made contact with plaintiffs by telephone three or four days after the occurrence. On cross-examination, he testified that the traffic light was green for east and west traffic, and as far as he could recall, "there was no eastbound traffic at the moment of impact."

Defendant was called as an adverse witness. He was employed by the CTA as a bus driver and used 22nd

Street daily and was familiar with it. He testified that it was a Saturday afternoon, and he had had "two drinks" of whiskey in celebration of a deal he had made for the exchange of his automobile, and he began to "head home." As he proceeded in a westerly direction down 22nd Street and approached the intersection of 50th and 22nd, it was sleeting and snowing, and he had his headlights on. He had been going this route periodically for about seven years. He saw the other vehicle before the impact, and they were the only two cars on the street. The other vehicle was going 15 miles an hour, as was defendant. When the other vehicle allegedly made its left turn in front of him, it was from the lane just to the right of the "cutout lane," and it was directly "in front of me." He applied his brakes before the impact, and he did not think that the other vehicle applied its brakes. When he applied his brakes his speed was about 15 miles an hour, as was the other car, which was going "just about a north-easterly direction." In response to the question, "Do you recall having driven in a westerly direction on the side of the center divider for eastbound traffic?" defendant replied, "No, sir. I was in the proper lane." He was further examined regarding his prior testimony on deposition.

Among the witnesses called for defendant was Dr. David Petty, who had conducted a physical examination of Estelle Lilegdon. He was of the opinion that she made a complete recovery from her injuries, and that it was impossible, therefore, to have been any causal relationship between the trauma suffered and her subsequent hysterectomy. Plaintiffs objected to the testimony of Dr. Petty on the ground that they had not been furnished with a copy of the doctor's report ten days prior to trial in compliance with the rules of the Supreme Court.

Initially, we consider the contention of plaintiffs that it was error for the court to give to the jury the following instruction:

"In considering the case of Estelle Lilegdon you must first determine whether she was an owner of the vehicle in which she was riding and that the ride was for the mutual benefit of herself and her driver. If you determine this to be the fact, then you are instructed that the negligence, if any, of the driver is imputed to her.

"On the other hand, if you find that she was not the owner of the vehicle in which she was riding, or that the ride was not for the mutual benefit for herself and the driver, then the negligence, if any, of the driver is not imputed to her."

John Lilegdon testified that he was the owner of the automobile which he was driving. Mrs. Estelle Lilegdon testified that the car was owned by her and her husband, and on deposition she had testified that the automobile was "my husband's and mine" and that it was in "both" of their names. She had no driver's license and did not know how to drive the car.

From the foregoing testimony on car ownership, plaintiffs argue that the manifest weight of the evidence was that "Estelle Lilegdon had neither legal title, possession or control of the car and no legal right to possession or control of the car at the time the accident occurred," and "at most, the statements as to ownership amounted to a legal conclusion" and were not binding on the plaintiff. Harris v. Minardi, 74 Ill App2d 262, 220 NE2d 39 (1966).

Defendant argues that a fair reading of the imputed negligence instruction will reveal that the jury had the option of finding that the plaintiff, Estelle Lilegdon, was not the owner of the vehicle in which she was riding, or that the ride was not for the mutual benefit for herself and driver; that the instruction clearly required the jury to find that the ride was for the mutual benefit of Mrs. Lilegdon and her driver, as well as that she was the owner of the vehicle in question, and a reasonable inference is that the ride was for her benefit or at least for

the mutual benefit of her and her driver, who would have the use and benefit of his wife fulfilling her act and responsibility.

Defendant further argues that the right or ability of Estelle Lilegdon to drive an automobile is not at issue— the sole question is whether she had, as an owner on a ride for the mutual benefit of herself and her driver, the right to control the vehicle or the manner in which the vehicle was being operated.

█ Other than the testimony of the plaintiffs, the record does not include any further evidence as to the ownership of plaintiffs' car, and with this posture as to that issue, we believe plaintiffs' car ownership was a jury question.

█ The instant situation comes within the guidelines set forth in Simaitis v. Thrash, 25 Ill App2d 340, 166 NE 2d 306 (1960), where it is said (p 351):

> "Where an owner is a passenger in his automobile at the time of an accident, he is liable for the negligence of the driver of his automobile if (1) he has not abandoned his right to control the automobile, or (2) if he exercises or has a right to exercise any control over the driver or the operation of the automobile, or (3) if the ride is for his benefit or for the mutual benefit of himself and the driver. Palmer v. Miller, 310 Ill App 582, 35 NE2d 104; Palmer v. Miller, 380 Ill 256, 43 NE2d 973."

█ We conclude that it was proper for the trial court in this case to give the foregoing instruction on "imputed negligence." The jury here was instructed that if she was not the owner of the vehicle in which she was riding, or the ride was not for the mutual benefit of the plaintiffs, then the negligence of the driver was not to be imputed to her.

We consider next plaintiffs' contention that it was error to give a left turn "right of way" instruction. Plaintiffs

suggest that the trial court was "apparently confused by the significance of testimony showing that at the time the collision occurred the plaintiff's station wagon was projecting a few inches into the westbound lane on [22nd Street] and that the plaintiff's vehicle was moving at a slow rate of speed." Plaintiffs argue that the instruction was improper since, "as a matter of law, the cause of the collision was the defendant's intoxication and his sudden swerve from the eastbound to the westbound lane of traffic at the intersection of [22nd Street] and 50th Avenue. Illinois decisions establish that even where a party is guilty of making an illegal left-hand turn, he is not chargeable with contributory negligence where it is clear that the real cause of the collision was the negligence of the other driver. . . . Even assuming that the plaintiff's vehicle was in the process of making an illegal left-hand turn, the facts show that this fact had no causal relationship to the collision."

Defendant argues that "considering this plaintiff's admissions in his statements to the police officers (that he was in the process of making a left turn, travelling five miles per hour) as conceded in his cross-examination, a sufficient basis existed for the jury to determine that he was negligent, and that his negligence was the proximate cause of the occurrence. Certainly the jury heard the evidence, observed the demeanor of the witnesses as they testified, and were entitled to make their own decision as to what testimony was believable and what witnesses they found credible."

 After examining the testimony of the occurrence witnesses, we conclude it was not error for the trial court to give a "right of way" instruction in this case. Also, we are not persuaded that the verdict was contrary to the manifest weight of the evidence. The jury was sufficiently informed as to defendant's alleged intoxication at the time of the occurrence, and its value as a fac-

tor was for the determination of the jury. This is not a case in which an opposite conclusion to that of the jury is clearly evident, as is required before this court can disturb the verdict. Black v. DeWitt, 55 Ill App2d 220, 225, 204 NE2d 820 (1965).

Plaintiffs next contend that the trial court committed prejudicial error in permitting Dr. David Petty to testify in violation of Supreme Court Rule 17–1, since a medical report prepared by him had not been furnished to plaintiffs within the time required by the rule. Plaintiffs state that an order was entered on February 23, 1966, which required plaintiff to submit to a physical examination by Dr. Petty within 20 days, or on or before March 15, 1966, and the record shows that the medical report of Dr. Petty was not furnished to plaintiffs' counsel until April 12, 1966, after the case had been assigned for trial, although the examination had been made on March 24, 1966. Plaintiffs assert that nothing in the record suggests why the report could not have been made available by April 1, 1966, or 10 days prior to trial, as the Supreme Court Rule requires. In support, plaintiffs cite Harris v. Minardi, 74 Ill App2d 262, where the court stated (p 268):

> "We now hold that Supreme Court Rule 17–1 is mandatory and that a failure to comply with the Rule prohibits the use of the medical report except at the instance of the party examined or at the instance of the party who produced the person examined."

And on page 269:

> "Permitting such testimony or any medical testimony in violation of the Rule constitutes reversible error."

On this point the record shows that on February 23, 1966, Judge Schultz ordered that plaintiff Estelle Lilegdon submit herself for examination by Dr. David T. Petty

271

within 20 days; on March 4, 1966, the cause was dismissed for want of prosecution by Judge Ward; on March 14, 1966, the plaintiffs moved to vacate the dismissal for want of prosecution, stating that on March 7, Estelle Lilegdon had sought a ten-day delay in the examination, which was agreed to by defendant's examining doctor. The dismissal order was then vacated and the cause was returned to the "active trial calendar on March 31, 1966, to be added below the black line."

It is not disputed by defendant that a copy of the written report of Dr. Petty, the examining physician, was not delivered to the attorney for the party examined ten days before trial, as required by Rule 17–1(3). The copy was delivered to plaintiffs' attorney on April 12, 1966, the day the case was assigned out for the trial, which commenced on April 13, 1966.

When defendant offered Dr. Petty as a witness, plaintiffs' counsel objected to his testimony because of noncompliance with Rule 17–1. Out of the presence of the jury, the trial court considered at length the arguments of counsel, the mandatory or discretionary character of the rule, the events preceding the trial, including the dismissal of the case and its reinstatement and return to the active trial calendar, and the element of surprise to plaintiffs. The court finally permitted Dr. Petty to testify, stating, "Incidentally, I can't help but say, although there is a claim of surprise, there has been no announcement here of any action that has been taken that prevents the plaintiff from being in a position to meet whatever the report may contain, or whatever testimony may be forthcoming."

 After examining this record, we believe the sequence of the facts presented to the court justified the use of sound discretion by the court in determining whether the penalty for failure to comply with the time require-

ment should be applied, and we find no abuse of that discretion here.

■ Finally, we consider plaintiffs' contention that the trial court erred prejudicially in refusing plaintiffs the right to rebut Dr. Petty as to his experience as a gynecologist. Dr. Petty testified on behalf of defendant as an expert in gynecology. Plaintiffs' cross-examination sought to show that he had little, if any, actual surgical experience in this area. Dr. Petty stated that he had performed a hysterectomy within the prior six months at Augustana Lutheran Hospital. Plaintiffs then subpoenaed the record librarian of Augustana Hospital, who appeared in court prepared, according to the offer of proof made by plaintiffs' counsel, to testify that the hospital records did not show that Dr. Petty had performed surgery at the hospital as he had testified. After some colloquy between court and counsel, the court ruled that the proffered testimony was not impeaching, stating, "The object of the plaintiff isn't solely related to the educational and professional background of the witness involved," and the impeachment offer was not on a point material to the issues and one of the ultimate facts involved. We find no abuse of discretion here.

For the reasons given, the judgment of the trial court is affirmed.

Affirmed.

BURMAN and ADESKO, JJ., concur.